**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| ALLIANCE FOR THE WILD ROCKIES, | No. 24-1500 |
| | D.C. No. 2:19-cv-00332-REP |
| *Plaintiff - Appellant*, | |
| v. | |
| JEANNE HIGGINS, Idaho Panhandle National Forest Supervisor; UNITED STATES FOREST SERVICE, an agency of the U.S. Department of Agriculture; UNITED STATES FISH & WILDLIFE SERVICE, an agency of the U.S. Department of Interior, | OPINION |
| *Defendants - Appellees*. | |

Appeal from the United States District Court
for the District of Idaho
Raymond Edward Patricco, Jr., Magistrate Judge, Presiding

Argued and Submitted March 20, 2025
Submission Vacated March 21, 2025
Resubmitted July 16, 2026
San Francisco, California

Filed July 16, 2026

2        ALLIANCE FOR THE WILD ROCKIES V. HIGGINS

Before: Ryan D. Nelson, Danielle J. Forrest, and Jennifer Sung, Circuit Judges.

Opinion by Judge Forrest;
Dissent by Judge R. Nelson

## SUMMARY[*]

### Environmental Law

The panel reversed the district court's summary judgment in favor of the United States Forest Service in an action brought by the Alliance for the Wild Rockies challenging the Forest Service's decision that the Healthy Forest Restoration Act ("HFRA") exempted the Hanna Flats Good Neighbor Authority Project—a restoration project in the Idaho Panhandle National Forest—from full National Environmental Policy Act ("NEPA") review.

The Alliance sued to enjoin the Project, asserting that it did not fall within the "wildland-urban interface," as defined by HFRA, and therefore was not exempt from NEPA review. The district court granted summary judgment based on issue exhaustion—that Alliance failed to challenge the applicability of the Forest Service's asserted HFRA-exemption.

NEPA mandates that agencies prepare an environmental impact statement (EIS) for federal actions significantly

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

affecting the quality of the human environment. Where an agency determines in advance that a class of actions will not significantly affect the environment, it may categorically exempt such actions from NEPA review. Following HFRA's procedures, the Forest Service published a Scoping Notice outlining the Project's objectives and components and soliciting feedback.

In deciding whether to impose an issue-exhaustion requirement to HFRA scoping under 16 U.S.C. § 6591b(f), the panel first considered whether scoping was the type of administrative proceeding that warranted requiring issue exhaustion. The panel held that scoping under HFRA was analogous to the informal non-notice-and-comment rulemaking at issue in *Alaska Survival v. Surface Transp. Bd.*, 705 F.3d 1073 (9th Cir. 2013). The panel further held that because nothing about the scoping process under § 6591b(f) generally, or how the Forest Service implemented this process for the Hannah Flats Project specifically, resembled an adversarial proceeding, the nature of this proceeding suggested that a judicially imposed issue-exhaustion requirement was improper.

The panel next considered whether the type of claim that Alliance asserted warranted imposing issue exhaustion, separate from the nature of the underlying proceeding. The panel held that the Forest Service's failure to apply the governing statutory definition of wildland-urban interface was not the kind of challenge that must normally be exhausted before the agency.

The panel concluded that there was no statutory or regulatory issue-exhaustion requirement, and a judicially imposed issue-exhaustion requirement was unwarranted. Accordingly, the panel reversed the district court's grant of

summary judgment, and remanded for the district court to address the merits of Alliance's challenge.

Dissenting, Judge R. Nelson would hold that the administrative waiver doctrine applied to the HFRA notice-and-scoping process. Alliance had notice of the need to raise its wildland-urban-interface objection and a full opportunity to do so, but it never did. Alliance waived the issue before the agency. The majority reached the opposite result by discarding settled principles of informal rulemaking and importing an adversariness framework from Social Security adjudication that other courts have refused to extend to the rulemaking context.

## COUNSEL

Rebecca K. Smith (argued), Public Interest Defense Center PC, Missoula, Montana, for Plaintiff-Appellant.

Joan M. Pepin (argued), Jacob D. Ecker, Emma L. Hamilton, John P. Tustin, Allen Brabender, and Rachel Heron, Attorneys, Environment & Natural Resources Division; Adam R.F. Gustafson, Acting Assistant Attorney General; Todd Kim, Assistant Attorney General; United States Department of Justice, Washington, D.C.; Elise Foster, Attorney, Office of the General Counsel, United States Department of Agriculture, Washington, D.C.; for Defendants-Appellees.

## OPINION

FORREST, Circuit Judge:

The United States Forest Service proposes a logging project to increase the health of the Idaho Panhandle National Forests by addressing "insect or disease infection" and reducing wildfire fuel, among other things. The project is called the Hanna Flats Good Neighbor Authority Project. Usually, the Forest Service must assess the environmental impacts of a project like this under the National Environmental Policy Act (NEPA). But here, after conducting an initial scoping process under the Healthy Forest Restoration Act (HFRA) and informally soliciting feedback from the public and other regulatory entities, the Forest Service concluded that HFRA exempted the Hanna Flats Project from full NEPA review. Plaintiff-Appellant Alliance for the Wild Rockies sued the Forest Service, challenging this exemption decision. The Forest Service successfully moved for summary judgment based on issue exhaustion—that Alliance failed to challenge the applicability of the Forest Service's asserted HFRA-exemption. We reverse and remand. There is no statutory or regulatory issue-exhaustion requirement, and a judicially imposed issue-exhaustion requirement is unwarranted where neither the administrative proceeding at issue—HFRA scoping—nor the nature of Alliance's challenge warrant requiring issue exhaustion under governing precedent.

## BACKGROUND

### A. Governing Statutes

NEPA mandates that agencies prepare an environmental impact statement (EIS) for all "major Federal actions

significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C); *see also id.* § 4336(b)(1). "The EIS must address the significant environmental effects of a proposed project and identify feasible alternatives that could mitigate those effects." *Seven County Infrastructure Coal. v. Eagle County*, 605 U.S. 168, 172 (2025). Promulgation of an EIS requires notice-and-comment rulemaking. 42 U.S.C. § 4336a(c); *see also Bering Strait Citizens for Responsible Res. Dev. v. U.S. Army Corps of Eng'rs*, 524 F.3d 938, 951–52 (9th Cir. 2008). Often, agencies prepare "a more limited document" known as an environmental assessment (EA) to determine if a project requires a full EIS. *See Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 757 (2004); *see also* 42 U.S.C. § 4336(b)(2). But where an agency determines in advance that a class of actions will not significantly affect the environment, it may categorically exempt such actions from NEPA review. *See* 42 U.S.C. §§ 4336(a)(2), 4336c. As relevant here, HFRA specifies the procedures to be used for exempted projects.

Among other purposes, HFRA was enacted to address the impact of insect and disease infestations and to reduce the risk of wildfires in national forests. *See* 16 U.S.C. § 6501; *see also id.* § 6551(a)(1)(A) (recognizing the link between insect infestation or disease and increased wildfire risk). To those ends, Congress directed the Forest Service to "implement authorized hazardous fuel reduction projects" either on "[f]ederal land in wildland-urban interface areas" or federal land that suffers from "an epidemic of disease or insects." *Id.* § 6512(a)(1), (4); *see also id.* § 6511(16) (defining "wildland-urban interface"). Such projects generally must comply with NEPA. *Id.* § 6514(a)–(d). "Collaborative restoration project[s]," however, are

categorically excluded from NEPA's requirements. *Id.*
§ 6591b(a)(1).

As the name suggests, collaborative restoration projects
are forest-restoration projects that are "developed and
implemented through a collaborative process" that "includes
multiple interested persons representing diverse interests."
*Id.* § 6591b(b)(1)(C). These projects are limited by size,
location, and purpose, and must comply with specified
procedural requirements. *See id.* §§ 6591a(b), (d), 6591b(a)–
(c). The purpose of a collaborative restoration project must
be to either "reduce the risk or extent of, or increase the
resilience to, insect or disease infestation," or to "reduce
hazardous fuels." *Id.* § 6591a(d). They must be located "in
the wildland-urban interface" or specified areas outside of it.
*Id.* § 6591b(c)(2). And particularly relevant here, to initiate
a collaborative restoration project, the Forest Service must
"conduct public notice and scoping." *Id.* § 6591b(f).

## B. The Hanna Flats Project

Beginning in 2016, the Forest Service began developing
the Hanna Flats Project through a collaborative process
involving state actors, local landowners, and conservation
groups. This Project sought to, among other things, "reduce
the risk or extent of, or increase resilience to, insect or
disease infestation" in the Idaho Panhandle National Forests
and to decrease "hazardous forest fuels to reduce the current
and future wildfire risk to people, private lands, and resource
values."

Following HFRA's procedures, the Forest Service
published a Scoping Notice outlining the Project's
objectives and components and soliciting feedback from the
public. The Scoping Notice stated that the Project "area lies
entirely within the wildland-urban interface defined by

Bonner County." It also suggested that the Project was "being planned with the goal that it would meet all the required conditions" for the HFRA categorical exclusion from NEPA review under 16 U.S.C. § 6591b(a). Consistent with that plan, the Notice asserted that the Project was located entirely within the wildland-urban interface. It did not specify, however, that the wildland-urban interface definition the Forest Service was relying on in reaching this conclusion was Bonner County's definition rather than HFRA's definition.

The Scoping Notice was sent to numerous individuals and groups, including Alliance. The cover letter sent to Alliance "request[ed] feedback on" the Hanna Flats Project "to identify potential issues" that were not already "identified during the collaborative process." The letter advised that "there is a potential to use [NEPA] categorical exclusions" for the Project and that "some aspects of the proposed action are likely to change" before the final decision is issued. The letter also advised that comments could be submitted by letter or email. Alliance submitted numerous comments on the Scoping Notice.

Ultimately, the Forest Service issued a Decision Memo outlining the Project and invoking a categorical exclusion from NEPA review under § 6591b(a). The Forest Service concluded that the Project was designed to treat insect infestation and disease within "the wildland-urban interface," and that it met all other procedural requirements.

### C. Alliance's Lawsuits

Alliance sued to enjoin the Project, asserting that it did not fall within the "wildland-urban interface," as that term is defined by HFRA, and therefore is not exempt from NEPA review. From that point, the litigation over the Hanna Flats

Project has traversed through a procedural wilderness. Magistrate Judge Bush initially agreed with Alliance and held that the Forest Service failed to demonstrate that the Project fell within the wildland-urban interface under HFRA and remanded the issue to the agency without vacating the Project. *See All. for the Wild Rockies v. Higgins* (*Hanna Flats I*), 535 F. Supp. 3d 957, 974–81 (D. Idaho 2021). Thereafter, the Forest Service issued a Supplemental Decision Memo further elaborating on the issue. *See All. for the Wild Rockies v. Pierson (Hanna Flats II)*, 550 F. Supp. 3d 894, 897 (D. Idaho 2021).

After the Forest Service issued its Supplemental Decision Memo, Alliance filed a second lawsuit "alleging that the Project is unlawful" under both the initial Decision Memo and the Supplemental Decision Memo. *Id.* at 898. District Judge Winmill was assigned the second case and preliminarily enjoined the Project. *See id.* at 907. The Forest Service appealed the decisions in both cases.

In the *Hanna Flats I* appeal, we held that Alliance's comments following issuance of the initial Decision Memo failed to alert the Forest Service that the Project fell outside the wildland-urban interface. *All. for the Wild Rockies v. Petrick*, 68 F.4th 475, 489–90 (9th Cir. 2023). But we did not resolve whether this failure resulted in forfeiture of Alliance's claim. Rather, we remanded "for the district court to consider in the first instance whether any such comments were necessary to challenge a project exempted from NEPA analysis" under § 6591b(a)'s categorical exclusion. *Id.* at 490.[1]

---

[1] For this reason, the Forest Service's suggestion that our decision in the *Hanna Flats I* appeal resolved whether Alliance forfeited its claim is

In our decision in the *Hanna Flats II* appeal, in part because the Forest Service failed to argue that Alliance forfeited its wildland-urban-interface claim, we treated the Forest Service's forfeiture argument itself as forfeited and addressed the merits of that appeal. *Id.* at 490–98 & 490 n.5. We held that whether the Project fell within Bonner County's definition of "wildland-urban interface" was immaterial because HFRA defines this term and the statutory definition governs. *Id.* at 494. Nonetheless, we held that the district court erred by rejecting the idea that new information provided in the Supplemental Decision Memo could justify the HFRA categorical exclusion. *Id.* at 495–96. We, therefore, vacated the preliminary injunction and remanded that case as well. *See id.* at 495–98.

Following our remand, the Forest Service withdrew its Supplemental Decision Memo and reinstated its initial Decision Memo. *All. for the Wild Rockies v. Higgins*, 690 F. Supp. 3d 1177, 1184 (D. Idaho 2023). A third judge—Chief Magistrate Judge Patricco—oversaw the proceedings on remand in both *Hanna Flats I* and *II*, but the two cases were not consolidated. *See id.* at 1185. Judge Patricco concluded in *Hanna Flats I* that Alliance was required to raise its wildland-urban interface objection during the scoping process. *All. for the Wild Rockies v. Higgins*, No. 2:19-cv-00332, 2024 WL 113552, at *5–10 (D. Idaho Jan. 10, 2024). Accordingly, this challenge was deemed forfeited and

---

incorrect. Our decision in *Hanna Flats I* specifically remanded for the district court to determine whether administrative waiver applied to scoping under § 6591b(f). *See* 68 F.4th at 483 ("We remand to the district court to consider Alliance's unaddressed argument that there is no administrative-objection requirement in this context.").

summary judgment was granted for the Forest Service. Before us now is Alliance's appeal from that decision.[2]

## DISCUSSION

Litigants challenging agency action generally must exhaust their administrative remedies before seeking judicial review. *Woodford v. Ngo*, 548 U.S. 81, 88–89 (2006). Exhaustion of administrative remedies "means using all steps that the agency holds out [for review], and doing so *properly*." *Id.* at 90 (quotation omitted). Requiring administrative exhaustion "protects 'administrative agency authority'" by giving the agency the opportunity to "correct its own mistakes." *Id.* at 89 (quoting *McCarthy v. Madigan*, 503 U.S. 140, 145 (1992), *superseded by statute,* Prison Litigation Reform Act, 42 U.S.C. § 1997e(a) (1996), *as recognized in Woodford*, 548 U.S. 81). It also "promotes efficiency" because administrative proceedings are usually less cumbersome and lengthy than federal litigation and create a useful record for judicial review. *Id.* Failure to exhaust administrative remedies when required may foreclose judicial review. *See Petrick*, 68 F.4th at 488.

Issue exhaustion, also called administrative waiver, *SSA Terminals v. Carrion*, 821 F.3d 1168, 1174 (9th Cir. 2016), is a related but separate principle, *see Carr v. Saul*, 593 U.S.

---

[2] While the second *Hanna Flats I* appeal was pending, Judge Patricco granted partial summary judgment to Alliance in *Hanna Flats II* and again remanded the Project to the Forest Service without vacatur. *All. for the Wild Rockies v. U.S. Forest Serv.*, 774 F. Supp. 3d 1253, 1278–79 (D. Idaho 2025). An appeal of that decision is also pending in this court. We invited the parties' views on whether these appeals should be consolidated. Neither party addressed the potential impact the decision in this case might have on the second appeal in *Hanna Flats II*, and Alliance opposed consolidation. Thus, we declined to consolidate the appeals sua sponte.

83, 88 n.2 (2021) ("Issue exhaustion should not be confused with exhaustion of administrative remedies."). Issue exhaustion "require[s] parties to give the agency an opportunity to address a[ specific] issue before seeking judicial review of that question." *Id.* at 88. Thus, when applicable, a court must determine whether a party first raised its challenge to the agency before seeking Article III review. *See Petrick*, 68 F.4th at 488.

Issue exhaustion may be mandated by statute or regulation. *Carr*, 593 U.S. at 88. But when both are silent, the judiciary may impose an issue-exhaustion requirement in some circumstances. *See id.*; *Alaska Survival v. Surface Transp. Bd.*, 705 F.3d 1073, 1080 (9th Cir. 2013). Judicially imposed issue exhaustion, like a judicial requirement to exhaust administrative remedies, turns on "both the nature of the claim presented and the characteristics of the particular administrative procedure provided." *McCarthy*, 503 U.S. at 146 (holding exhaustion of administrative remedies was not required for prisoner's constitutional claim); *see also Alaska Survival*, 705 F.3d at 1080 (quoting *Sims v. Apfel*, 530 U.S. 103, 113 (2000) (O'Connor, J., concurring in part and in judgment)) (applying the same framework to issue exhaustion).

In this case, the governing statute and regulations do not impose issue exhaustion. Congress directed the Secretary of Agriculture to create an administrative-review process for most projects arising under HFRA. 16 U.S.C. § 6515(a), (c); *see also* 36 C.F.R. §§ 218.1–218.32. It also required issue exhaustion for most HFRA projects. 16 U.S.C. § 6515(c)(2). But Congress specifically exempted "collaborative restoration projects" from the administrative-review process, which in turn exempted such projects from the issue-exhaustion requirement. *Id.* § 6591b(a)(2). The Forest

Service concedes that no other statute or regulation requires issue exhaustion here.[3] Therefore, for issue exhaustion to apply, it must be judicially imposed.[4]

In deciding whether we should impose issue exhaustion to § 6591b(f) scoping, we must answer two questions. First, whether scoping is the type of administrative proceeding that warrants requiring issue exhaustion.[5] And second, whether

---

[3] We do not "trample" on Congress's design by not imposing issue exhaustion, as the dissent suggests, when Congress is silent on this issue. *See* Dissent at 45. Congress clearly knows how to mandate issue exhaustion when it wants to—it has not done so here.

[4] Because we ultimately conclude that a judicially imposed issue-exhaustion requirement is inappropriate, we need not resolve whether the negative implication of § 6591b(a)(2) would categorically forbid us from imposing such a requirement. *See Island Creek Coal Co. v. Bryan*, 937 F.3d 738, 747–49 (6th Cir. 2019) (discussing the judiciary's uncertain source of authority for imposing issue exhaustion).

[5] The Forest Service and the dissent argue that Alliance waived reliance on this framework by failing to raise *Sims* or *Carr* to the district court or in its initial briefing on appeal. We disagree. "When an issue or claim is properly before the court, the court is not limited to the particular legal theories advanced by the parties, but rather retains the independent power to identify and apply the proper construction of governing law." *Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 99 (1991). Both below and in its opening brief on appeal, Alliance argued that issue exhaustion was not required. It is not determinative, as a matter of party presentation, that Alliance neglected relevant legal authority directly bearing on that issue; we must apply the correct law to decide the issue raised on appeal. *See id.*; *see also Ctr. for Investigative Reporting v. Dep't of Just.*, 14 F.4th 916, 943–44 (9th Cir. 2021) (Bumatay, J., dissenting) ("[A]s judges, our duty is to get the law right."). Moreover, concerns with deciding questions not subjected to adversarial testing were addressed by our separate orders that the parties address the applicability of *Carr* at oral argument and, post-argument, that the parties file supplemental briefing addressing four questions, including their positions on the application of *Carr* and whether this issue was

Alliance's wildland-urban-interface challenge is the type of claim that warrants requiring issue exhaustion, regardless of the nature of the administrative proceeding.

## A.  Type of Proceeding

In the context of agency adjudications, the Supreme Court has held that "courts decide whether to require issue exhaustion based on 'an analogy to the rule that appellate courts will not consider arguments not raised before trial courts,'" which requires consideration of whether an administrative proceeding was "adversarial" or "inquisitorial." *Carr*, 593 U.S. at 88–89 (quoting *Sims*, 530 U.S. at 108–09). The Forest Service argues that the adversarialness of the underlying administrative proceeding is only relevant in assessing whether the court should require issue exhaustion when the underlying proceeding was an agency adjudication. This is incorrect. Under our precedent, we must consider adversarialness when evaluating issue exhaustion stemming from both agency adjudications and non-notice-and-comment rulemaking proceedings.

We begin with the Supreme Court's decisions laying out the adversarialness analysis. In *Sims*, the Court held that a Social Security claimant seeking judicial review did not forfeit issues that were not raised to the Social Security Appeals Council. 530 U.S. at 105. No statute or regulation imposed an issue-exhaustion requirement, *id.* at 108, and the Court explained that "[t]he basis for a judicially imposed issue-exhaustion requirement is an analogy to the rule that appellate courts will not consider arguments not raised

---

forfeited.  *See, e.g.*, *United Ass'n Local 38 Pension Tr. Fund v. Aetna Cas. & Sur. Co.*, 790 F.2d 1428, 1432 n.3 (9th Cir. 1986) (Norris, J., concurring in part),

before trial courts." *Id.* at 108–09. "Where the parties are expected to develop the issues in an adversarial administrative proceeding, . . . the rationale for requiring issue exhaustion is at its greatest." *Id.* at 110. The Court concluded that the litigation analogy did not hold in *Sims* because, in proceedings before the Social Security Appeals Council, the agency is required to "investigate the facts and develop the arguments both for and against granting benefits," and the Appeals Council must review the entire record *sua sponte*, *see id.* at 110–12 (plurality).[6]

A few years later, again in the context of Social Security adjudication, the Supreme Court held that Social Security claimants did not forfeit their Appointments Clause challenges to the authority of the agency's administrative law judges (ALJs) even though this challenge was not raised to the ALJs themselves. *Carr*, 593 U.S. at 85. The Court reiterated its rule from *Sims*—that "the desirability of a court imposing a requirement of issue exhaustion depends on the degree to which the analogy to normal adversarial litigation applies in a particular administrative proceeding," *id.* at 88 (quoting *Sims*, 530 U.S. at 109) (citation modified)—but did not conclusively decide whether proceedings before Social Security ALJs are adversarial or not, *see id.* at 92; *see also id.* at 92 n.5. Instead, the Court held that both the nature of a structural constitutional challenge to ALJ authority and the futility of raising that issue to the very actors who allegedly lacked power "tip[ped] the scales . . . against imposing an issue-exhaustion requirement." *Id.* at 92–95. Only three

---

[6] Justice O'Connor concurred in part, reasoning that "the agency's failure to notify claimants of an issue exhaustion requirement" was "a sufficient basis for" the Court's decision that the requirement did not apply. *Id.* at 113 (O'Connor, J., concurring in part and concurring in the judgment).

Justices would have squarely held that proceedings before Social Security Administration ALJs are non-adversarial. *See id.* at 96–97 (Thomas, J., concurring).

Following *Sims*, our cases have distinguished between administrative adjudications and rulemaking challenges as they relate to adversarialness. *Compare, e.g.*, *Vaught v. Scottsdale Healthcare Corp. Health Plan*, 546 F.3d 620, 630–33 (9th Cir. 2008) (applying *Sims*'s framework to adjudications under the Employment Retirement Income Security Act) *with Universal Health Servs., Inc. v. Thompson*, 363 F.3d 1013, 1020 (9th Cir. 2004) ("[*Sims*] turned on the unique nature of Social Security benefit proceedings and offers no relevant guidance to rulemaking."). And most of our decisions, as well as our sister circuits' decisions, applying *Sims* and *Carr* arise from administrative adjudications. *E.g.*, *Obrien v. Bisignano*, 142 F.4th 687, 694–701 (9th Cir. 2025); *United Refin. Co. v. EPA*, 64 F.4th 448, 457 (3d Cir. 2023).

But we crossed this dividing line and addressed the *Sims* framework in the rulemaking context in *Alaska Survival*, holding that *Sims* is categorically inapplicable only to notice-and-comment rulemaking, not to all rulemaking. 705 F.3d at 1080–81. At issue in *Alaska Survival* was a challenge raised by environmental organizations to the Surface Transportation Board's exemption of a railroad from the full licensing provisions of the Interstate Commerce Commission Termination Act (ICCTA). *See id.* at 1076. The agency "did not request comment[s]" during the EIS process nor did it "provide[] direct notice of or request[] public comment on the exemption." *Id.* at 1077, 1081. Nonetheless, the environmental organizations submitted numerous comments on both the draft and final EIS, although they did

not argue that the ICCTA exemption was improper. *See id.* at 1077, 1081.

In holding that the environmental organizations had not forfeited their ability to raise their exemption challenge in the subsequent litigation, we relied on *Sims* in concluding that issue exhaustion was not required. *See id.* at 1080–81. We recognized our prior precedent holding that "*Sims* 'offers no guidance' in the notice-and-comment rulemaking context." *Id.* at 1080 (quoting *Universal Health Servs., Inc.*, 363 F.3d at 1020). But we distinguished that precedent because *Alaska Survival* did not involve formal notice-and-comment rulemaking. *Id.* Instead, we found "instructive" the principle developed in our adjudication-context precedent that "when an agency engages in a non-adversarial, informal proceeding and does not provide notice of issue exhaustion requirements, then judicially created issue exhaustion is likely inappropriate." *Id.* And we held in *Alaska Survival* that issue exhaustion was not required because the rulemaking procedure at issue was "informal and provided no notice to interested parties that to later challenge the [Board's] decision one must submit comments during the exemption process." *Id.* This was true even though the agency received comments in response to both its draft and final EIS and responded to those comments. *Id.* at 1076–77. We explained that "[b]ecause this administration process lacks an adversarial component, 'the reasons for [us] to require issue exhaustion are much weaker.'" *Id.* at 1081 (quoting *Sims*, 530 U.S. at 110) (alteration in original).

We see no material distinction between *Alaska Survival* and the circumstances presented here. Therefore, consistent with our decision in that case, here we must determine whether HFRA's non-adjudicative scoping process is analogous to notice-and-comment rulemaking. If it is not,

then we must consider whether scoping under HFRA is adversarial. But before reaching these issues, we first describe HFRA's scoping process.

**1.**

HFRA refers to "scoping" in several sections, *see* 16 U.S.C. §§ 6512(e)(4)(C), 6514(c)(1)(C), 6515(a)(3), 6591a(d)(2), 6591b(f), but it does not define this term. "Scoping" first appeared in the 1978 NEPA regulations, *see* 43 Fed. Reg. 55978, 55982, 55993–94 (Nov. 29, 1978), which were in effect both when HFRA was initially enacted and when it was later amended.[7] Because Congress used several terms of art from the 1978 regulations in HFRA— including "categorical exclu[sion]" and "scoping"—we rely on the regulations to understand Congress's original meaning. *See George v. McDonough*, 596 U.S. 740, 746 (2022) ("Where Congress employs a term of art obviously transplanted from another legal source, it brings the old soil with it." (citation modified) (citation omitted)).

Under the 1978 NEPA regulations, scoping was an "early and open process" employed after an agency decided "to prepare an [EIS]." 40 C.F.R. § 1501.7 (2003) *amended by* 85 Fed. Reg. 43357, 43359; *see also id.* at § 1501.4; 43

---

[7] HFRA was originally enacted in 2003, *see* Pub. L. No. 108-148, 117 Stat. 1887 (2003), and subsequently amended in 2014, *see* Pub. L. No. 113-79, §§ 8204–05, 128 Stat. 649, 915–21 (2014). The 1978 NEPA regulations remained in effect with minimal amendment until 2020. *See generally* 85 Fed. Reg. 43304 (July 16, 2020). Ultimately, due to suggestions from courts that the Center for Environmental Quality (CEQ) lacked authority to promulgate the NEPA regulations, *see Marin Audubon Soc'y v. FAA*, 121 F.4th 902, 908–09, 912–15 (D.C. Cir. 2024), the regulations were repealed, 90 Fed. Reg. 10610, 10610–16 (Feb. 25, 2025). But these regulations still guide the interpretation of "scoping" in HFRA.

Fed. Reg. at 55982. This process helped determine "the scope of issues to be addressed and" to identify "the significant issues related to a proposed action." 40 C.F.R. § 1501.7 (2003). It required agencies to "[i]nvite the participation" of interested parties, which could take the form of public meetings. *Id.* at § 1501.7(a)(1), (b)(4). And in consultation with interested parties, the agency would determine which issues to analyze in the EIS and would "eliminate from detailed study the issues which are not significant." *Id.* § 1501.7(a)(2), (3).[8]

Of course, because HFRA mandates scoping for projects categorically excluded from NEPA review, *see* 16 U.S.C. § 6591b(a)(1), (f), the ultimate goals of scoping under HFRA necessarily differ from those outlined in the 1978 NEPA regulations. Rather than conducting scoping to identify the issues to be addressed in a further NEPA review, we understand scoping under § 6591b(f) to require an open process under which the agency solicits feedback from the public on the scope and components of a project and iterates the project based on the feedback that it receives. This interpretation aligns with the other provisions in § 6591b— namely, that a collaborative restoration project must be "developed and implemented through a collaborative process that" "includes multiple interested persons representing diverse interests" and that is "transparent and

---

[8] We observe that there are slight differences between the Forest Service's 2008 NEPA regulations and 1978 CEQ NEPA regulations. *See* 73 Fed. Reg. 43084, 43094, 43096 (July 24, 2008). Namely, scoping under the Forest Service's regulations was a process used before preparation of an EA. *See* 36 C.F.R. §§ 220.4(e), 200.6(c) (2008). These distinctions do not affect our analysis in this case, and we do not resolve which version of scoping, if either, Congress codified in HFRA or its 2014 amendments.

nonexclusive" or otherwise complies with other methods of public participation. *Id.* § 6591b(b)(1)(C).

## 2.

With that background, we turn to whether scoping under HRFA is analogous to formal notice-and-comment rulemaking or to the non-notice-and-comment EIS process at issue in *Alaska Survival*. This question is easily answered. Scoping as a general matter is an informal process that often precedes formal NEPA review, which requires notice-and-comment rulemaking. 40 C.F.R. §§ 1501.7; 1503.1 (1978). Scoping does not require publication in the Federal Register or compliance with specified procedural guardrails. *See* 36 C.F.R. § 220.4(e); 40 C.F.R § 1501.7 (2008). Nor does it require that interested parties comment or that the agency consider the views raised in any comments. *See* 16 U.S.C. § 6591b(f); 36 C.F.R. § 220.4(e) (2008). And like *Alaska Survival*, nothing in HFRA or the Forest Service's Scoping Notice issued in this case told Alliance that it was required to comment during the scoping process to preserve the ability to challenge the Forest Service's final decision.

The statutory context also indicates that HFRA scoping is not analogous to formal notice-and-comment rulemaking. As stated, NEPA review requires full notice-and-comment rulemaking. 40 C.F.R. § 1503.1 (1978). Section § 6591b permits scoping for projects that are *categorically excluded* from NEPA's requirements. 16 U.S.C. § 6591b(a)(1), (f). It would be illogical to conclude that scoping is as formal as the process that § 6591b expressly avoids.

The dissent tries to sidestep *Alaska Survival* by drawing immaterial factual distinctions and artificially narrowing its holding. First, the dissent contends that the rulemaking proceeding in *Alaska Survival* was more informal than the

process here because the agency there did not provide notice of the claimed exemption or solicit public comment on it and because the agency's applicable regulations provided that public comments generally were not sought on exemption petitions. Dissent at 50–53. The dissent misreads the notice that *Alaska Survival* found material.

*Alaska Survival* relied not on the failure to provide notice about the public-comment process generally but on the agency's failure to provide "notice to interested parties that to later challenge the [agency's] decision one must submit comments during the [agency's] process." 705 F.3d at 1080. Such notice was also lacking here. The Forest Service's Scoping Notice did not inform interested parties that they *had* to raise an issue during the scoping process to preserve the ability to later challenge the agency's final decision. And the dissent's suggestion that the Forest Service responding to the comments that it received is a meaningful difference also fails because the agency in *Alaska Survival* also received and responded to comments from interested parties, and yet we determined that judicially imposed issue exhaustion was not required. *Id.* at 1076–77.

Second, the dissent mischaracterizes the holding in *Alaska Survival* by suggesting that it is "best read" as simply identifying "exceptional circumstances sufficient to excuse waiver." Dissent at 53. The dissent further asserts that this prior decision does not counsel against applying judicially imposed issue exhaustion here because "[n]othing in *Alaska Survival* suggests that a process that provides notice and generates comments considered by the agency is too informal to apply the administrative waiver doctrine." *Id.* at 19. This is plainly wrong. As already discussed, the relevant notice concerning the *necessity* of public comment was lacking in both cases. And in both cases the agency received

and addressed public comments during its decision-making process (even though the agency in *Alaska Survival* did not invite comments). *Alaska Survival*, 705 F.3d at 1076–77. In sum, the rulemaking process here was not as different in character from the process in *Alaska Survival* as the dissent suggests. Rather, the dissent seemingly disagrees with *Alaska Survival*'s application of *Sims*' reasoning concerning adversarialness of the proceeding to informal rulemaking. But as a three-judge panel, we are bound to follow *Alaska Survival*. *See Miller v. Gammie*, 335 F.3d 889, 899–900 (9th Cir. 2003) (en banc).

For these reasons, we conclude that scoping under HFRA is analogous to the informal non-notice-and-comment rulemaking at issue in *Alaska Survival*. We next consider whether it is adversarial.

**3.**

We explained in *Alaska Survival* that where an "administrative process lacks an adversarial component, 'the reasons for [us] to require issue exhaustion are much weaker.'" *Id.* at 1081 (quoting *Sims*, 530 U.S. at 110). "The critical feature that distinguishes adversarial proceedings," which require issue exhaustion, "from inquisitorial ones," which do not, is whether the parties "bear the responsibility to develop issues" before the agency. *Carr*, 593 U.S. at 89. Several factors may influence this inquiry, including (1) whether the agency classifies the proceeding as adversarial, *Sims*, 530 U.S. at 111 (plurality); *Carr*, 593 U.S. at 91; (2) whether the parties are required to file briefs, *Sims*, 530 U.S. at 111 (plurality); and (3) whether the parties were notified that issue exhaustion was required, *id.* at 113 (O'Connor, J., concurring in part and concurring in the judgment); *Carr*, 593 U.S. at 91. In conducting this inquiry,

we follow the Supreme Court's admonition not to "reflexively assimilate the relationship of administrative bodies and the courts to the relationship between lower and upper courts." *Carr*, 593 U.S. at 89 (citation modified).

Nothing in HFRA, or the NEPA regulations that govern scoping that were in place when HFRA was enacted and amended, suggest that interested parties were obligated to comment during scoping. Instead, all sources suggest that scoping is informal and is used at a stage where the agency has not yet fully committed to a position. And the Forest Service's support for a project is immaterial to whether the review process is adversarial when the process is statutorily described as "collaborative." *See* 16 U.S.C. § 6591b(b).

The Scoping Notice for the Hanna Flats Project and the letter sent to Alliance do not suggest anything different. The Notice outlined the Forest Service's purpose and need for the Project, the collaborative efforts underway, and the proposed activities for the Project, among other things. The letter sent to Alliance invited feedback via mail or email and stated that if a categorical exclusion was applied, there would be no additional public comment. Neither document suggests anything like an adversarial process, or that the Forest Service was requiring issue exhaustion.

Because nothing about the scoping process under § 6591b(f) generally or how the Forest Service implemented this process for the Hanna Flats Project specifically resembles an adversarial proceeding, the nature of this proceeding suggests that a judicially imposed issue-exhaustion requirement would be improper. *Alaska Survival*, 705 F.3d at 1081. We turn next to whether the type of claim that Alliance asserts warrants imposing issue exhaustion, separate from the nature of the underlying proceeding.

### B.  Type of Claim

There are two lines of cases that we must consider in assessing whether the type of claim presented mandates issue exhaustion. First, courts have required issue exhaustion where the claim alleges that the agency inadequately responded to a concern raised during the administrative proceeding, even when the proceeding was not necessarily adversarial. *See Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council*, 435 U.S. 519, 549–55 (1978); *Dept. of Transp. v. Pub. Citizen*, 541 U.S. 752, 764–65 (2004). Second, courts have declined to require issue exhaustion where the agency is ill-equipped to address the issue, even where the proceeding may have been adversarial. *See Carr*, 593 U.S. at 92–95.

Here, the Forest Service suggests that issue exhaustion was required because Alliance raises a "routine objection" to application of the wildland-urban-interface categorical exemption. We disagree.

### 1.

In *Vermont Yankee* and *Public Citizen*, the Supreme Court held that parties must raise proposed NEPA alternatives to the agency before the agency's selection and analysis of alternatives can be challenged as arbitrary and capricious. *See Vt. Yankee*, 435 U.S. at 549–55; *Pub. Citizen*, 541 U.S. at 764–65. This reasoning is not implicated here.

NEPA requires agencies to consider alternatives to a proposed action in an EIS. 42 U.S.C. § 4332(2)(C)(iii); *see also Audubon Soc'y of Portland v. Haaland*, 40 F.4th 967, 980 (9th Cir. 2022). Because NEPA is enforceable only through the APA, an agency's action can be set aside for failure to consider alternatives only if the agency acted

arbitrarily and capriciously. *See Env't Def. Ctr. v. Bureau of Ocean Energy Mgmt.*, 36 F.4th 850, 871 (9th Cir. 2022). Typically, an agency action is arbitrary and capricious in this context if the agency fails to "examine the relevant data and articulate a satisfactory explanation for its action," "entirely fail[s] to consider an important aspect of the problem," or "offer[s] an explanation for its decision that runs counter to the evidence before the agency." *Motor Vehicles Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). An agency may also act arbitrarily and capriciously if it fails to consider and respond to "significant" comments received during notice-and-comment rulemaking. *Perez v. Mortgage Bankers Ass'n*, 575 U.S. 92, 96 (2015) (citing *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971)); *Thompson v. Clark*, 741 F.2d 401, 408 (D.C. Cir. 1984) (Scalia, J.)); *see also City & County of San Francisco v. USCIS*, 944 F.3d 773, 800 (9th Cir. 2019) ("An agency's failure to respond to any particular comment or point put forward by a rule's opponent is not a ground for finding per se arbitrary-and-capricious action.").

In *Vermont Yankee*, multiple groups opposed a company's permit application to construct two nuclear reactors. *See* 435 U.S. at 529–31. One group submitted numerous comments to the draft EIS, some of which related to alternative actions promoting energy conservation that the agency should have considered. *Id.* at 532. But that group chose "not to appear at or participate in" hearings held on the draft EIS. *Id.* Later, in response to legal developments, the group moved to reopen the administrative proceedings. *See id.* at 533. The agency denied the motion, reasoning that the group had not presented its energy-conservation alternatives to the requisite degree of proof. *See id.* at 533–34. The Supreme Court upheld the agency's decision, concluding

that the group forfeited its NEPA-alternatives argument by not identifying the alternatives that it wanted the agency to consider with sufficient specificity. *See id.* at 550–55. That is, the agency did not err under the APA by not considering proposed alternatives that were not adequately presented. *See id.* at 554.

*Public Citizen* is no different. There, the agency issued an EA that addressed the environmental effects of two rules related to lifting a moratorium on motor carriers domiciled in Mexico. *See* 541 U.S. at 759–62. The plaintiffs failed to submit any comment about the agency's "failure properly to consider possible alternatives to the proposed action . . . that would mitigate the environmental impact of the authorization of cross-border operations by Mexican motor carriers." *Id.* at 764. Thus, again, the Court held that the plaintiffs forfeited their NEPA-alternatives challenge. *See id.* at 764–65 ("Because respondents did not raise these particular objections to the EA, [the agency] was not given the opportunity to examine any proposed alternatives to determine if they were reasonably available. Respondents have therefore forfeited any objection to the EA on the ground that it failed adequately to discuss potential alternatives to the proposed action.").

Neither case suggests a categorical rule that *all* objections not raised to the agency are forfeited. Instead, the Supreme Court's reasoning in both flows from the common-sense principle that an agency must have an opportunity to review an alternative to its proposed action before its failure to do so can be arbitrary and capricious. By statute, agencies must consider a "no action alternative," 42 U.S.C. § 4332(2)(C)(iii), but they need not otherwise consider an "infinite range of alternatives," *Ctr. for Biological Diversity v. Bureau of Land Mgmt.*, 141 F.4th 976, 995 (9th Cir. 2025)

(quotation omitted). Agencies necessarily rely on interested parties to present alternative paths forward for consideration.

Our caselaw analyzing issue exhaustion under *Vermont Yankee* and *Public Citizen* has been limited to a NEPA-alternatives analysis or something highly similar. *E.g.*, *Earth Island Inst. v. U.S. Forest Serv.*, 87 F.4th 1054, 1063 (9th Cir. 2023) ("[I]n order to object to an agency's failure to address alternatives, a party must have submitted comments identifying, or otherwise urging, alternative(s) beyond those evaluated in the EA [unless] an agency has independent knowledge of the issue."); *Barnes v. U.S. Dep't of Transp.*, 655 F.3d 1124, 1132–36 (9th Cir. 2011) (discussing forfeiture of indirect-effects, cumulative-effects, and alternatives challenges under NEPA). Indeed, we recognize "a distinction between situations in which NEPA plaintiffs submitted comments that did not alert the agency to their concerns . . . and situations in which plaintiffs allege procedural violations of NEPA." *'Ilio'ulaokalani Coal. v. Rumsfeld*, 464 F.3d 1083, 1092 (9th Cir. 2006). The former often triggers an issue-exhaustion requirement while the latter does not. *See id.* at 1092; *see also Nw. Env't Def. Ctr. v. Bonneville Power Admin.*, 117 F.3d 1520, 1534–35 (9th Cir. 1997) (stating that "*Vermont Yankee* does not 'establish a broad rule which would require participation in agency proceedings as a condition precedent to seeking judicial review of an agency decision,'" and concluding that petitioner's procedural challenge to the public comment process was not forfeited because the agency had "a duty to comply with [such process] . . . regardless of whether participants complain of violations" (quoting *Kunaknana v. Clark*, 742 F.2d 1145, 1148 (9th Cir. 1984))).

The Hanna Flats Project did not receive full NEPA review because the Forest Service concluded that it fell

within HFRA's wildland-urban-interface categorical exclusion under 16 U.S.C. § 6591b. Specifically, the Forest Service found that "[t]he entire project is within the wildland-urban interface." Alliance claims that the Forest Service acted outside its statutory authority by improperly relying on this categorical exclusion because the Project is not in fact entirely within the wildland-urban interface, as that term is defined in HFRA. Previously, we held that Alliance's challenge must proceed under the APA, and accordingly, that we review whether the Forest Service acted arbitrarily or capriciously in deciding that the Project was located entirely in the wildland-urban interface. *Petrick*, 68 F.4th at 491–92. We made clear, however, that "[w]hat constitutes a wildland-urban interface is specifically defined by HFRA," and that the agency may not invoke the categorical exclusion in a manner that "on its face deviates from HFRA and likely results in a covered area beyond what Congress authorized." *Id.* at 494 (citation modified).

This is not the type of claim to which we imply an issue-exhaustion requirement under *Vermont Yankee* and *Public Citizen*.[9] Unlike a claim alleging that an agency acted arbitrarily by failing to consider NEPA alternatives, the

[9] The Forest Service and the dissent contend that *Vermont Yankee* and *Public Citizen* do establish a general rule applicable in all rulemaking cases, or at least all NEPA cases. But as the foregoing discussion shows, these cases imposed a built-in issue-exhaustion requirement for particular NEPA claims related to proposed alternatives or factors for consideration relevant to an agency's decision on how best to proceed. While issue exhaustion might be required for similar claims under other statutes, *cf., e.g.*, *Nw. Env't Def. Ctr.*, 117 F.3d at 1534–35, these cases do "not establish a broad rule which would require participation in agency proceedings as a condition precedent to seeking judicial review of an agency decision," *id.* at 1534 (internal quotation marks and citation omitted).

nature of Alliance's claim does not depend on commenters offering information or options for the agency to weigh, and Alliance does not claim that the agency erred by not considering or responding to comments. Instead, Alliance alleges that the Forest Service acted outside its statutory authority. While we give some deference to the facts underlying the Forest Service's legal conclusion, that does not alter the nature of the claim. Thus, we next turn to whether Alliance's claim is inherently forfeitable under the second line of cases described above.

**2.**

The Forest Service asserts that because the decision in *Carr* was not based on adversarialness but rather held that the structural-constitutional claims presented there were non-forfeitable, Alliance's claim here is inherently forfeitable regardless of whether scoping is adversarial. We disagree.

The Forest Service is correct that although *Carr*'s test is framed in terms of adversarialness, its holding focused on the type of claim presented. *Carr* acknowledged that social-security proceedings before ALJs "may be comparatively more adversarial" than the Appeals Council proceedings addressed in *Sims*. 593 U.S. at 92. It then held that "[i]n the specific context of petitioners' Appointments Clause challenges," the presence of a structural constitutional challenge that would have been futile to raise to the ALJs themselves "tip[ped] the scales decidedly against imposing an issue-exhaustion requirement." *Id.* And the Court left open whether "the scales might tip differently" in a different context, "such as in the sphere of routine objections to individual benefits determinations." *Id.* at 92 n.5. Put another way, *Carr* suggests that even where proceedings are

adversarial, there are some claims that should not be subject to a judicially imposed issue-exhaustion requirement.

At least one of our sister circuits has treated *Carr*'s discussion of adversarialness as dicta. In *Morris v. McDonough*, the Federal Circuit held that it was immaterial whether the administrative proceedings were adversarial because the veteran's due-process claim was not a structural constitutional challenge like the claim in *Carr*, and it could have been presented to the Board of Veterans' Appeals (which regularly hears such claims). 40 F.4th 1359, 1364 (Fed. Cir. 2022). We understand *Carr* differently. Just because the Court held that the constitutional claim at issue in that case was non-forfeitable does not mean that all other kinds of claim *are* forfeitable. The Supreme Court has clearly indicated that adversarialness is an independent criterion. *See Sims*, 530 U.S. at 108–10; *accord, e.g.*, *Sandoz Inc. v. Becerra*, 57 F.4th 272, 278–79 (D.C. Cir. 2023). And while *some* claims, like the NEPA-alternative claims discussed in the previous subsection, are forfeitable, Alliance's claims do not fit into that category. Accordingly, we conclude that where an administrative adjudication or non-notice-and-comment rulemaking is non-adversarial, and where it is dissimilar from the types of claims addressed in *Vermont Yankee* and *Public Citizen*, it is presumptively improper for courts to impose an issue-exhaustion requirement.

The dissent argues that not imposing issue exhaustion here violates the basic principle that an agency must be given a "fair opportunity . . . to apply its expertise, to correct its own errors, and to create a record for our review." Dissent at 40–41 (quoting *Petrick*, 68 F.4th at 489). Citing the D.C. Circuit, the dissent further asserts that the fair-opportunity requirement applies the same to factual and legal challenges.

*Id.* We do not dispute the general fair-opportunity principle or its wisdom. But it is not ironclad. As we have explained, issue exhaustion is not automatic when neither Congress nor the agency imposes it. *See Carr*, 593 U.S. at 88–89. A court faced with the choice of whether to require issue exhaustion by judicial fiat must "careful[ly] examin[e] the characteristics of 'the particular administrative procedure provided.'" *Id.* at 89 (quoting *Sims*, 530 U.S. at 113 (O'Connor, J., concurring in part and concurring in judgment)); *see also Alaska Survival*, 705 F.3d at 1080. And the rationale underlying enforcement of waiver is weakened for statutory-interpretation issues that "do[] not require the development of a factual record, the application of agency expertise, or the exercise of administrative discretion." *Railroad Yardmasters of Am. v. Harris*, 721 F.2d 1332, 1338–39 (D.C. Cir. 1983) (discussing *McKart v. United States*, 395 U.S. 185, 198–99 (1969)); *see also La. Forestry Ass'n v. Dep't of Lab.*, 745 F.3d 653, 669 n.14 (3d Cir. 2014); *Itochu Bldg. Prods. v. United States*, 733 F.3d 1140, 1146 (Fed. Cir. 2013); *cf. Island Creek Coal*, 937 F.3d at 749. The D.C. Circuit has further concluded that concerns about sandbagging the agency are lessened where the agency "has a preexisting duty to examine key assumptions" underlying its decision. *Okla. Dep't of Env't Quality v. EPA*, 740 F.3d 185, 192 (D.C. Cir. 2014) (citation modified).

It is also worth noting that rejecting a legal challenge as unexhausted makes little sense if the proponent was not given an adequate opportunity to identify the basis for its challenge in the administrative proceedings. *Cf. Louis v. U.S. Dep't of Labor*, 419 F.3d 970, 975 (9th Cir. 2005) (clarifying that the notice provided in notice-and-comment rulemaking must "fairly apprise interested persons" of the issues before the agency (citation modified)). While scoping under HFRA

is intended to be a "collaborative" and "transparent" process, 16 U.S.C. § 6591b(b)(1)(C), the record here reveals that the Forest Service did not indicate in its Scoping Notice that it was relying on Bonner County's definition of wildland-urban interface rather than HFRA's definition. The Forest Service simply asserted that "the entire project area is in the wildland-urban interface" without giving any indication that it was relying on authority beyond HFRA in making that determination.

In explaining that hazardous forest fuels need to be remediated to reduce forest fire risks—one of the forest management needs that would be served by the Project—the Scoping Notice did state that the "project area lies entirely within the wildland-urban interface defined by Bonner County.". But in context, this single reference to the County's definition did not signal that the Forest Service was relying on that local definition in applying HFRA's categorical exclusion because it appears in a section that does not discuss the legal requirements for the categorical exclusion. Nor did the Scoping Notice indicate that the County's definition was inconsistent with HFRA's definition. The Scoping Notice did note that "[t]he forest plan identifies fuel reduction in the wildland-urban interface as one of the top seven responsibilities and roles across the Idaho Panhandle National Forests," but the Forest Plan utilizes HFRA's definition for wildland-urban interface, not the County's definition. *Compare U.S. Dep't of Agric.*, Land Management Plan, Idaho Panhandle National Forests 129 (2015 rev.) *with* 16 U.S.C. § 6511(16). So that reference also gave Alliance no reason to suspect that the Forest Service was improperly applying Bonner County's definition. The more reasonable view is that the basis for Alliance's statutory challenge was not apparent until the Forest Service

issued its Decision Memo. Consequently, the notion of fairness, invoked by the dissent, weighs against judicial imposition of an issue exhaustion requirement, not in favor of it.

## CONCLUSION

The Forest Service determined that the Hanna Flats Project is categorically excluded from NEPA review under 16 U.S.C. § 6591b(a) based on the "key assumption" that the Project is located within a wildland-urban interface. 28 U.S.C. § 6591b(c)(2)(A). But as we explained in *Petrick*, the Forest Service improperly applied Bonner County's definition of a wildland-urban interface, which is "a broader definition unmoored from the specifics of HFRA." 68 F.4th at 494 (emphasis added). While the dissent may be correct that the Forest Service might have corrected this error had it been pointed out during the scoping process, the justifications for applying issue exhaustion do not apply here. HFRA scoping under § 6591b(f) is analogous to non-notice-and-comment rulemaking and is non-adversarial. And Alliance's claim that the Forest Service failed to apply the governing statutory definition of wildland-urban interface is not the kind of challenge that must normally be exhausted before the agency. Accordingly, we reverse the district court's grant of summary judgment for the Forest Service in *Hanna Flats I*. [10] On remand, the district court

---

[10] Our dissenting colleague's assertion that our decision goes beyond what the APA allows and violates the government's limited waiver of sovereign immunity is puzzling because he authored our prior decision in which we concluded that the Forest Service's reliance on the Project being located within the wildland-urban interface to justify categorically excluding it from NEPA review "is the sort of error of judgment that arbitrary or capricious review [under the APA] is meant to prevent." *Id.* (citation modified). The import of our decision today is simply to say

should address the merits of Alliance's challenge—i.e., whether the Forest Service can establish that the categorical exclusion applies using the proper definition of wildland-urban interface or whether the Forest Service arbitrarily and capriciously found that the Project is categorically excluded from NEPA review. *See Petrick*, 68 F.4th at 491–92, 493–95 (holding that arbitrary-and-capricious review applies and that the Forest Service's reasoning that "the Project fell within the wildland-urban interface designated by the Bonner County community plan" was insufficient).

**REVERSED and REMANDED.**

---

R. NELSON, Circuit Judge, dissenting:

The Forest Service launched a notice-and-scoping procedure under the Healthy Forest Restoration Act (HFRA), 16 U.S.C. § 6591b(f), to determine whether the Hanna Flats Project qualified for a categorical exemption from the National Environmental Policy Act (NEPA). A categorical exemption allows the agency to bypass NEPA's requirement to prepare either an Environmental Assessment (EA) or an Environmental Impact Statement (EIS). Along with 250 other environmental groups, the Forest Service sent

---

that Alliance is not precluded from advancing its statutory challenge even though Alliance did not raise this error during the scoping process. We do nothing more than what we have already done in terms of reviewing the agency's work. And in any event, the dissent's rationale for judicially imposing issue exhaustion—atextual policy preferences for respecting the work of agencies and improving the orderliness of review of administrative decisionmaking—"bears some resemblance to . . . now-disfavored" administrative law doctrines. *See Island Creek Coal*, 937 F.3d at 749.

Alliance for the Wild Rockies (Alliance) notice of the proceeding, asked it to participate, and said no further opportunity to comment may be allowed. The Forest Service explained that it believed the Hanna Flats Project could qualify for a categorical exemption because it was within a wildland-urban interface. *See* 16 U.S.C. § 6591b(a)(2). Nearly a decade and two appeals later, Alliance seeks remand to raise a new argument that the Forest Service applied the wrong definition of wildland-urban interface. Under every principle undergirding administrative law, Alliance has waived the issue.

The majority ignores these principles and decides that Alliance can raise a new issue in this late stage of the process. But the majority only reaches this conclusion by inventing its own ad hoc approach. The novel approach announced today rejects administrative waiver primarily by grafting adjudicatory rules into informal rulemaking.

The majority's approach fails from the start because it ignores that notice and scoping under HFRA is a rulemaking process. In the rulemaking context, the general rule is that a party must first raise the issue before the agency so the agency can respond. A party generally cannot raise a new issue—even a legal one—for the first time before the court. In holding otherwise, the majority blurs the lines between rulemaking and adjudication. In its most glaring misstep, the majority imports an adversariness requirement that has no place outside the adjudication context. No court has ever applied it in the rulemaking context where notice and comment was sought and relied on. The majority does so today, splitting with our sister circuits which have consistently over nearly a century distinguished those two contexts.

Once those lines are restored, the result is straightforward: HFRA's notice-and-scoping procedure is informal rulemaking. Nothing in the administrative record suggests the process was so informal as to render exhaustion futile. To the contrary, the Forest Service expressly sought Alliance's comments, warned that no further opportunity to comment would follow, and responded to the comments it received.

The majority not only reaches the wrong result on this narrow question under HFRA—it disturbs the foundations of administrative law. Today's decision blurs the lines between informal rulemaking and adjudication. Rather than treating administrative waiver as the general rule, the majority treats it as an exception. Executive agencies will be left uncertain about the rules they must follow. And future courts will be more inclined to allow parties to challenge agency decisions with waived claims, further burdening the administrative process. This is an unforced error. I respectfully dissent.

## I

As the district court properly concluded,[1] the administrative waiver doctrine bars Alliance's wildland-urban-interface claim. The majority's refusal to apply administrative waiver misunderstands both the governing law and the agency proceedings. Start with the law governing rulemaking. "[T]here is a near absolute bar against raising new issues—factual or legal—on appeal in the administrative context." *Nat'l Wildlife Fed'n v. EPA*,

---

[1] The parties consented to the jurisdiction of Chief U.S. Magistrate Judge Raymond E. Patricco. *See All. for Wild Rockies v. Higgins*, 2024 WL 113552, at *4 & n.7 (D. Idaho Jan. 10, 2024).

286 F.3d 554, 562 (D.C. Cir. 2002), *supplemented sub nom. In re Kagan*, 351 F.3d 1157 (D.C. Cir. 2003); *accord Sims v. Apfel*, 530 U.S. 103, 112 (2000) (O'Connor, J., concurring in part and concurring in the judgment) ("In most cases, an issue not presented to an administrative decisionmaker cannot be argued for the first time in federal court. On this underlying principle of administrative law, the Court is unanimous.").

The majority never acknowledges this rule. Instead, the majority turns the exception on its head. The majority now holds that the general rule is that waiver does not apply unless it has been specifically provided for by Congress. Under this new rule, litigants may ordinarily raise new issues for the first time in federal court unless a special exception for the "type of administrative proceeding" or "type of claim" applies. Maj. Op. at 13–14. The majority gleans this new rule from Justice O'Connor's concurrence in *Sims*, where she stressed that the "characteristics of the particular administrative procedure" may provide an exception to the general rule of administrative waiver. *See Sims*, 530 U.S. at 113 (O'Connor, J., concurring in part and concurring in the judgment) (citation omitted). Worse, by treating the administrative waiver doctrine as an exception triggered by certain claims or proceedings, the majority glosses over fundamental doctrinal differences.

There are two foundational distinctions in administrative law. The first is between rulemaking and adjudication. *See SEC v. Chenery Corp.* (*Chenery Corp. II*), 332 U.S. 194, 202 (1947); *United States v. Fla. E. Coast Ry. Co.*, 410 U.S. 224, 244–46 (1973). The second is between formal and informal proceedings. *See* 5 U.S.C. §§ 553, 556; *see also Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 54 (2020) (Thomas, J., concurring in the judgment and

dissenting in part).  Together these distinctions produce four basic categories of agency action: formal adjudication, informal adjudication, formal rulemaking and informal rulemaking.  1 Charles H. Koch, Jr. & Richard Murphy, *Administrative Law and Practice* § 2:10 (3d ed. 2026).  The differences matter, as each is governed by its own procedural requirements.  *See id.*  As the majority tacitly concedes, *see* Maj. Op. at 16–17, HFRA's notice-and-scoping process falls into the fourth category, informal rulemaking.  *See Alaska Survival v. Surface Transp. Bd.*, 705 F.3d 1073, 1080 (9th Cir. 2013) (an agency "conducts rulemaking when it grants an exemption" to statutory requirements); *see also Providence Yakima Med. Ctr. v. Sebelius*, 611 F.3d 1181, 1188 (9th Cir. 2010) (distinguishing rulemaking from adjudication because rulemaking "affects the rights of broad classes of unspecified individuals" and operates prospectively (citation omitted)).

Under our precedent, that conclusion alone should place the majority's holding on the shakiest of foundations.  The administrative waiver doctrine applies to informal rulemaking unless there is an exception.  *See, e.g.*, *Universal Health Servs., Inc. v. Thompson*, 363 F.3d 1013, 1020 (9th Cir. 2004).  Two reasons justify this doctrine—fairness to the agency and respect for closed-record review—and the notice-and-scoping process here satisfies both.  The majority's reasons for departing from these principles of agency rulemaking do not withstand scrutiny.

## A

### 1

The administrative waiver doctrine applies to informal rulemaking.  The majority is correct that the novel analysis it fashions today is "categorically inapplicable" to

notice-and-comment rulemaking. *See* Maj. Op. at 16. We, and "every other circuit to have addressed the issue," have held that the administrative waiver rule applies in "notice-and-comment rulemaking" under the Administrative Procedure Act (APA). *Universal Health Servs.*, 363 F.3d at 1020 (citing *Nat'l Wildlife Fed'n*, 286 F.3d at 562; *BCCA Appeal Group v. EPA*, 355 F.3d 817, 828–29 & n.10 (5th Cir. 2003); *Mich. Dep't of Envtl. Quality v. Browner*, 230 F.3d 181, 183 n.1 (6th Cir. 2000); *USA Grp. Loan Servs. v. Riley*, 82 F.3d 708, 713–14 (7th Cir. 1996); *1000 Friends of Md. v. Browner*, 265 F.3d 216, 228 n.7 (4th Cir. 2001)). But the majority fails to explain why.

Other courts provide an explanation. "There are two reasons for this" fundamental rule of administrative law. *Advocs. for Highway & Auto Safety v. Fed. Motor Carrier Safety Admin.*, 429 F.3d 1136, 1150 (D.C. Cir. 2005). The first is "[s]imple fairness to those who are engaged in the tasks of administration" and the "litigants." *United States v. L.A. Tucker Truck Lines, Inc.*, 344 U.S. 33, 37 (1952); *see also Nuclear Energy Inst., Inc. v. EPA*, 373 F.3d 1251, 1297 (D.C. Cir. 2004) ("[This] hard and fast rule of administrative law" is "rooted in simple fairness."). This requires courts to balance two related concerns. The litigants have a right to be heard and should have notice that the agency intends to engage in rulemaking that may be "relevant to them." *Universal Health Servs.*, 363 F.3d at 1020–21.

The other concern is the respect for the work of a coequal branch of government. An agency's work in promulgating a rule is just that—work. It is unfair for courts to "topple over administrative decisions" when the agency had no notice that it erred. *L.A. Tucker Truck Lines*, 344 U.S. at 37. Respect for "orderly procedure and good administration

require[s]" agencies to have an "opportunity for correction" while it is still feasible.  *Id.*

The second reason is constitutional.  Like NEPA, HFRA does not create an independent cause of action.  Alliance must sue under the APA.  *Cf. ONRC Action v. BLM*, 150 F.3d 1132, 1135 (9th Cir. 1998) (NEPA); *All. for the Wild Rockies v. Petrick*, 68 F.4th 475, 493 (9th Cir. 2023) (HFRA); 5 U.S.C. § 702.  The APA's waiver of sovereign immunity does not authorize courts "to second-guess agency rulemaking decisions." *Advocs. for Highway & Auto Safety*, 429 F.3d at 1150.  "[R]ather, the role of the court is to determine whether the agency's decision is arbitrary and capricious for want of reasoned decisionmaking." *Id.* (citing *Motor Vehicle Manufacturers Ass'n of the United States, Inc. v. State Farm Mut. Auto. Ins.*, 463 U.S. 29, 43 (1983)); *see also* 5 U.S.C. § 706 ("In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error.").  We must construe waivers of sovereign immunity narrowly, meaning that the narrow scope of APA review "is not just a meaningless procedural hurdle to overcome, but a fundamental constitutional protection to government agency action." *Ramos v. Wolf*, 975 F.3d 872, 900 (9th Cir. 2020) (R. Nelson, J., concurring), *reh'g en banc granted, opinion vacated*, 59 F.4th 1010 (9th Cir. 2023).

And since our role is to review the agency's decision, it necessarily follows that we must allow the agency to make the decision in the first instance.  Courts sometimes describe this concept as a "'fair opportunity'" for the agency to address all issues "in the administrative forum." *Nuclear Energy Inst.*, 373 F.3d at 1290 (citation omitted).  A fair opportunity is an opportunity for the agency "to apply its

expertise, to correct its own errors, and to create a record for our review." *Petrick*, 68 F.4th at 489 (quoting *Portland Gen. Elec. Co. v. Bonneville Power Admin.*, 501 F.3d 1009, 1024 (9th Cir. 2007)). And as the D.C. Circuit has explained, the agency must get a chance to correct all errors, whether they are "legal or factual." *Nuclear Energy Inst.*, 373 F.3d at 1290. If the agency decides against correcting an error, we may correct the decision on review. Thus, the administrative waiver doctrine not only protects the ability of the agency to do its work, but it also confines our branch to its proper role in the constitutional order.

The Supreme Court has held that these two reasons apply to comments challenging "an agency's compliance with NEPA." *Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 764 (2004). In *Public Citizen*, the Department of Transportation (DOT) issued an EA concluding that a rule change for inspections of vehicles entering the United States from Mexico did not require a full EIS. *Id.* at 758, 761–62. After preparing an EA, DOT published two interim rules and welcomed public comment. *Id.* at 762. After DOT adopted the rules, several environmental groups petitioned for review, arguing DOT violated NEPA. *Id.*

The Supreme Court limited its review to factors considered in the EA. "None of the respondents identified in their comments any rulemaking alternatives beyond those evaluated in the EA." *Id.* at 764. Building on its prior precedent in *Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council*, 435 U.S. 519, 553 (1978), the Court explained that members of the public "challenging an agency's compliance with NEPA must structure their participation so that it alerts the agency to the parties' position and contentions, in order to allow the agency to give the issue meaningful consideration." *Pub.*

*Citizen*, 541 U.S. at 764 (cleaned up).   Petitioners thus "forfeited any objection to the EA" that they failed to preserve in their comment.  *Id.* at 764–65.

*Public Citizen* and *Vermont Yankee* show that challenges to a decision to bypass NEPA's EIS requirement are subject to the same "two reasons" for the administrative waiver doctrine as general informal rulemaking.  *Advocs. for Highway & Auto Safety*, 429 F.3d at 1150.  We have always understood *Public Citizen* and *Vermont Yankee* to hold that the administrative waiver doctrine applies to informal rulemaking unless the agency's mistake was "so obvious" as to obviate the need for a challenger to raise it.  *City of Los Angeles v. FAA*, 63 F.4th 835, 852 n.9 (9th Cir. 2023).[2]

But the question we face today is slightly different from the questions in these prior cases.   The administrative challenge to compliance with NEPA in *Public Citizen*

---

[2] *Carr v. Saul*, 593 U.S. 83 (2021), did not overrule *Public Citizen* and *Vermont Yankee*.  Yet the majority's reasoning leads to that conclusion. No court has even hinted at that result.  Contrary to the majority's reckless, off-the-cuff insinuation that the administrative waiver doctrine is "now-disfavored," Maj. Op. at 33 n.10 (quoting *Island Creek Coal Co. v. Bryan*, 937 F.3d 738, 749 (6th Cir. 2019)), the Supreme Court and our sister circuits continue to apply administrative waiver as the rule.  *Island Creek* applied the rule.  The quote the majority lifts out of context was in reference to other doctrines that are perhaps similar to one possible source for the judicial power to apply the doctrine—policy concerns favoring the agency.  The Sixth Circuit did not express the same concerns when discussing the possible constitutional source of the doctrine.  In any event, as the Sixth Circuit recognized, it is for the Supreme Court— not inferior courts like ours—to choose whether to reconceptualize the doctrine around a single constitutional source.  *See Island Creek*, 937 F.3d at 749–50.  It is hard to see how administrative waiver is disfavored when the majority recognizes that its reading of *Carr* creates a circuit split—with no other court on our side.

involved an APA notice-and-comment period which came after the agency prepared an EA. *See* 541 U.S. at 762, 764–65. The Forest Service decided here, after an informal process with public participation, that the Hanna Flats Project is categorically excluded from NEPA. The issue is thus whether the two reasons for administrative waiver apply with equal force to an informal comment period provided before considering NEPA requirements as they do to an APA comment period provided after an agency prepares an EA. They do.

2

Applying the administrative waiver doctrine to HFRA's notice-and-scoping process upholds both reasons for the doctrine. The fairness factor is satisfied because both the governing statutory framework and the facts show that Alliance had notice it needed to object during the administrative process. The statute mandates that the Forest Service "shall conduct public notice and scoping" for any project categorically exempt from NEPA. 16 U.S.C. § 6591b(f). Regulations require the agency to "[i]nvite the participation of . . . the proponent of the action, and other interested persons (including those who might not be in accord with the action on environmental grounds)." 40 C.F.R. § 1501.7(a)(1) (1978).

The administrative record confirms that the Forest Service invited Alliance to participate. The Forest Service published a 44-page scoping notice which explained its belief that the Hanna Flats Project area was subject to a categorical exclusion from NEPA. The Forest Service explained two grounds for the categorical exclusion. First, the project area was within a "wildland-urban interface," triggering the "insect and disease infestation" exemption.

Second, the area was designated under § 602(b), (c) of HFRA.  *See* 16 U.S.C. § 6591b(a), (c)(2)(A).

The Forest Service sent this notice to over 200 organizations and individuals, and issued a news release seeking public comments and explaining that "[l]ocal landowners, environmental groups, timber industry representatives, and recreational interests" were invited to participate.  Alliance was in this group.  In an accompanying cover letter, the Forest Service stressed that it was considering whether the Hanna Flats Project qualified for a categorical exclusion.  The letter welcomed comments and explained that "there would not be an additional public comment period where written comments are solicited" if the project qualified for a categorical exclusion.

Thus, the notice-and-scoping process gave Alliance ample notice of the need to submit comments on whether a categorical exclusion should apply.  That fulfilled the notice aspect of the fairness factor.  *See Universal Health Servs.*, 363 F.3d at 1020–21.

The respect for "orderly procedure and good administration" aspect also supports this conclusion.  *L.A. Tucker Truck Lines*, 344 U.S. at 37.  Alliance "provided extensive comments."  *Petrick*, 68 F.4th at 489.  The Forest Service responded to these comments and issued a "very detailed description of the changes that were made to the project activities as a result of the public comments."  This statement listed 103 changes to the proposed action.  And the Forest Service's Decision Memo confirmed its conclusion that the project qualified for a categorical exclusion for hazardous fuel reduction projects in insect and disease infestation areas.  *See* 16 U.S.C. § 6591b(a)(2).

The second reason for imposing issue exhaustion also applies. By excusing Alliance's failure to object during the notice-and-scoping process, the majority denies the Forest Service a fair opportunity to apply its expertise or correct any error in defining the project area within a wildland-urban interface. *See Lands Council*, 629 F.3d at 1076. The statutory definition of wildland-urban interface requires the Forest Service to determine whether the project area is "within or adjacent to an at-risk community." 16 U.S.C. § 6511(16)(A). Thus, if the proposed project does not fall into a wildland-urban interface, the Forest Service may have been able to correct the mistake during the notice-and-scoping process by adjusting the boundaries of the project or applying the correct definition. In fact, the Forest Service adjusted the boundaries of the project based on the comments it received. Giving the agency a fair opportunity to address the wildland-urban-interface question during scoping may have permitted the Forest Service to avoid litigation altogether. *Cf. Portland Gen. Elec. Co.*, 501 F.3d at 1024.

By refusing to apply the administrative waiver doctrine, the majority forces the agency to revisit basic issues years into the project. This gives groups seeking to prevent change an incentive to refuse to participate in the notice-and-scoping process and raise new legal objections years later. *Cf. Puga v. Chertoff*, 488 F.3d 812, 815 (9th Cir. 2007) (courts should avoid relaxing exhaustion requirements if doing so "would encourage the deliberate bypass of the administrative scheme."). By rewarding silence at the notice-and-scoping stage, the majority tramples Congress's design. HFRA exempts qualifying projects from NEPA's more rigorous EIS requirement, 16 U.S.C. § 6591b(a)(1), and authorizes the Forest Service to use the more collaborative notice-and-

scoping process instead of APA notice and comment, *id.* § 6591b(f); *see also Riverbend Farms, Inc. v. Madigan*, 958 F.2d 1479, 1484 (9th Cir. 1992) (describing notice-and-comment rulemaking as time-consuming). Under today's holding, a petitioner may obtain remand from an Article III court on legal issues it failed to raise before the agency, even years after scoping has closed. This is what happens when a court expands its review "beyond what the language [of the APA] requires." *Ramos*, 975 F.3d at 900 (R. Nelson, J., concurring) (quoting *United States v. Nordic Vill., Inc.*, 503 U.S. 30, 34 (1992)).[3]

## B

The majority defends its expanded review in two ways. Both fail under well-settled principles of informal rulemaking.

---

[3] The majority's assertion that this conclusion conflicts with *Petrick* is a red herring. Maj. Op. at 33 n.10. In the portion of the *Petrick* opinion addressing Alliance's motion for a preliminary injunction in *Hanna Flats II*, we proceeded to the likelihood of success on the merits after noting that the Forest Service had not raised an administrative-waiver argument. *See Petrick*, 68 F.4th at 489 n.5. That the Government may forfeit such an argument, however, does not mean a court may disregard the conditions Congress placed on its waiver of sovereign immunity. Administrative waiver works as a non-jurisdictional rule that the Government may forfeit by failing to assert it, *see Advocs. for Highway & Auto Safety*, 429 F.3d at 1149, but conditions on a waiver of sovereign immunity remain subject to strict construction when the Government properly raises them as a defense, *see Block v. N. Dakota ex rel. Bd. of Univ. & Sch. Lands*, 461 U.S. 273, 287 (1983). That a condition is not itself jurisdictional (and can be forfeited) does not change this. *See Wilkins v. United States*, 598 U.S. 152, 157–59 & n.3 (2023).

1

First, the majority claims that the principles announced in *Vermont Yankee* and *Public Citizen* do not apply. There are procedural differences between the notice-and-comment process the agencies provided to challenge the EAs in those cases and the notice-and-scoping procedure here. But the majority fails to articulate which difference makes the underlying principles inapplicable. The majority opinion could be read to suggest that comments challenging the EAs in those cases were more "analogous to formal notice-and-comment rulemaking" than notice and scoping. Maj. Op. at 20–21; *see also id.* at 23. If that were all the majority said, I would disagree about the level of formality.

But the majority's broad assertion that *Vermont Yankee* and *Public Citizen* are limited to certain claims will do far more mischief. The majority argues that those cases arose during arbitrary and capricious review under *State Farm*, 463 U.S. at 43. *See* Maj. Op. at 26–27. Our duty to ensure the agency "explore[d] and objectively evaluate[d] all reasonable alternatives" is limited. *Ctr. for Biological Diversity v. United States Bureau of Land Mgmt.*, 141 F.4th 976, 994 (9th Cir. 2025) (cleaned up); *see also State Farm*, 463 U.S. at 43.

Under the APA's narrow standard of review, we consider only the "agency decision based on the record the agency presents to the reviewing court." *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985). That limit applies to notice-and-comment rulemaking, whether factual or legal. When considering an "important aspect of the problem," *State Farm*, 463 U.S. at 43, no difference exists between legal requirements and factual considerations that may shape the ultimate policy outcome. "To preserve a legal or factual

48     ALLIANCE FOR THE WILD ROCKIES V. HIGGINS

argument, we require its proponent to have given the agency a 'fair opportunity' to entertain it in the administrative forum before raising it in the judicial one." *See Nuclear Energy Inst.*, 373 F.3d at 1290 (citing *Nat'l Ass'n of Mfrs.*, 134 F.3d at 1111). At bottom, either type of challenge to notice-and-comment rulemaking is the same basic claim that the agency action is "arbitrary, capricious," or "not in accordance with law." 5 U.S.C. § 706(2)(A).[4]

For this reason, the majority's effort to excuse the failure to exhaust as a challenge to the Forest Service's statutory authority falls flat. *See* Maj. Op. at 28–29. There is no difference between a waiver of factual or legal issues in a challenge to informal rulemaking. As explained above, the Forest Service may have been able to fix the mistake by applying the correct definition or adjusting the boundaries of the Hanna Flats Project. That is precisely why administrative waiver applies here.

There are exceptions to administrative waiver, but none apply. An agency action may commit errors "so obvious that there is no need for a commentator to point them out." *Pub. Citizen*, 541 U.S. at 765. And to be sure, many of those exceptions are more likely to apply to objections based on legal, rather than factual, errors. *See* Maj. Op. 30–31. Certain legal issues may fall under "a preexisting duty to examine key assumptions" which the agency must examine

---

[4] The record-review requirement and the doctrine of administrative waiver govern what a court may consider. *See* 5 U.S.C. §§ 702, 706. Once an issue is properly before us, our "task" is "to apply the appropriate APA standard of review." *Fla. Power & Light Co.*, 470 U.S. at 743. That means we generally must "defer to an agency's technical expertise" on factual questions, *City of Los Angeles*, 63 F.4th at 844, and apply independent judgment on legal questions, *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 412 (2024).

without notice from the public. *Oklahoma Dep't of Env't Quality v. EPA*, 740 F.3d 185, 192 (D.C. Cir. 2014). And "agency adjudications are generally ill suited to address structural constitutional challenges." *NLRB v. N. Mountain Foothills Apartments*, 157 F.4th 1089, 1097 (9th Cir. 2025) (quoting *Carr*, 593 U.S. at 92). But the majority never claims any exception applies here. In fact, our previous remand of *Hanna Flats II* expressly reserved whether Alliance could carry its burden of raising serious questions going to the merits, in light of factual issues such as whether the Nordman and Lamb Creek communities are "at risk communities." *Petrick*, 68 F.4th at 495–97 & n.7. At best, on summary judgment, the objection will raise a mixed question of fact and law. *Cf.* 5 U.S.C. § 706 ("[D]ue account shall be taken of the rule of prejudicial error."). The majority's suggestion that Alliance's objection raises a pure legal question not subject to administrative waiver is unfounded.[5]

Another way to reach the majority's holding is the possibility that notice and scoping—a more "collaborative process" than notice and comment rulemaking—is so informal that the normal reasons for administrative waiver do not apply. 16 U.S.C. § 6591b(b)(1)(C); *see also* 5 U.S.C.

---

[5] The majority also cites cases that have refused to apply the doctrine to pure legal questions because the "principal policy rationale for the waiver rule" is less compelling when addressing questions of "statutory interpretation." *R.R. Yardmasters of Am. v. Harris*, 721 F.2d 1332, 1338 (D.C. Cir. 1983). Ironically, it is this purely policy-focused rationale for administrative waiver—without consideration of the constitutional dimension—which the Sixth Circuit stated, "bears some resemblance to these now-disfavored doctrines" of prudential standing and implied causes of action. *Island Creek*, 937 F.3d at 749.

§ 553(c).  That possibility is also inapplicable, as discussed below.

2

The majority errs in finding "no material distinction" between notice and scoping and "the non-notice-and-comment EIS process at issue in *Alaska Survival*."  Maj. Op. at 17, 20.   To reorient the doctrinal landscape, *Vermont Yankee* and *Public Citizen* establish that agency actions that are both informal and rulemaking typically face administrative waiver.  Notice-and-comment rulemaking is the least formal process for agency rulemaking the APA permits.  *See Regents*, 591 U.S. at 54 (Thomas, J., concurring in the judgment and dissenting in part).  But Congress may authorize agency rulemaking through less formal means. Section 6591b(f), authorizing notice and scoping, is such a statute.  It is conceptually possible that one of these less formal proceedings is so "informal" that it does not "provide notice to interested parties" and thus prevents the public from filing "object[ions] to the proposed action."  2 Kristin E. Hickman & Richard J. Pierce, Jr., Administrative Law Treatise § 17.8 (6th ed. 2019 & Supp. 2023) (discussing *Alaska Survival*, 705 F.3d 1073).  In such an agency action, the reasons for administrative waiver are less compelling. That is the holding of *Alaska Survival*.

Contrary to the majority's understanding of that case, the administrative process in *Alaska Survival* was notably less formal than notice and scoping.   There, petitioners challenged a Surface Transportation Board (STB) decision granting a railroad corporation an exemption from the full licensing requirements to construct a new rail line.  705 F.3d at 1076.  The licensing requirement required preparation of an EIS.  *Id.* at 1078–79.  The STB started an EIS process and

published notice of those EIS proceedings, *id.* at 1076–77, but the agency "never provided direct notice of or requested public comment on the exemption" itself, *id.* at 1080. Instead, STB's regulations established that exemption proceedings were to be informal and that public comments were "generally not sought during consideration of exemption petition proposals." *Id.* (quoting 49 C.F.R. § 1121.4(a) (2012)). The agency's statements showed that it did not "usually rely on comments to frame issues for its review of exemption petitions." *Id.* at 1081.

None of those facts are present here. While the STB "never provided direct notice of or requested public comment" on the decision, *id.* at 1080, the Forest Service provided Alliance a cover letter and the scoping notice expressly soliciting comments and warning that no further opportunity to comment would follow if the project qualified for a categorical exclusion. The agency's regulations require it to "[i]nvite the participation of . . . interested persons," 40 C.F.R. § 1501.7(a)(1) (1978), rather than the STB regulations where "public comments [were] generally not sought," *Alaska Survival*, 705 F.3d at 1080 (quoting 49 C.F.R. § 1121.4(a)). Finally, the Forest Service did consider and respond to public comments submitted during the notice-and-scoping process. *See supra* at 43–46.

The two reasons supporting administrative waiver were not present in *Alaska Survival* the way they are here. The public could not waive issues before the agency because they lacked notice of "the 'appropriate time' in which to raise [] objections to the agency's decision." *Alaska Survival*, 705 F.3d at 1081. The governing regulations even established that "public comments [were] generally not sought." *Id.* at 1080 (quoting 49 C.F.R. § 1121.4(a) (2012)). Without notice of the appropriate time to object, the public has no fair

chance to preserve issues, and the rationale for waiver collapses. Further, fairness to the agency was not a concern. STB acknowledged that it did not consider public comments, *Alaska Survival*, 705 F.3d at 1081 (citing 49 C.F.R. § 1121.4(a)), so the agency did not rely on that administrative proceeding to decide issues. This means that the court could weigh new issues without disrupting the agency's work. Nothing in *Alaska Survival* suggests that a process that provides notice and generates comments considered by the agency is too informal to apply the administrative waiver doctrine.

The majority does not dispute these differences. It instead asserts that the differences are "immaterial." Maj. Op. at 20–22. The agency's provision of public notice and invitation of public participation are the most material considerations when determining whether excusing administrative waiver would invite judicial delay. The majority slips past this by moving the goalposts for agency notice. First, the majority claims that the only relevant factor in *Alaska Survival* was that "the STB's procedures were informal and provided no notice to interested parties that to later challenge the STB's decision one must submit comments during the exemption process." 705 F.3d at 1080. The majority cuts the first half of the sentence; the lack of specific notice that exemption process comments were necessary to preserve issues for judicial review was relevant as an example for why the "procedures were informal." *Id.*

Second, the majority claims that the Forest Service should have provided notice of its use of Bonner County's definition of wildland-urban interface. Maj. Op. at 31–33. But as we noted in *Petrick*, Alliance may have preserved the issue had it "allege[d] that the Project falls outside the wildland-urban interface." 68 F.4th at 489. Alliance had all

the notice it needed to make that objection, and it did not do so.  Finally, the majority asserts that the STB relied on public comments in *Alaska Survival*.  But a careful reading of that opinion paints a very different picture.  After public comment, STB "adopted all of the [proposed] environmental review and conclusions."  *Id.* at 1077.  Nothing in that administrative record suggests plaintiffs' unsolicited comments influenced the agency's decision, and the governing regulations expressly stated they did not.

The majority gives no reason to conclude that our case law treats a process with regulations establishing that "comments have added very little," *id.* at 1081 (cleaned up), as a process with "public notice," 16 U.S.C. § 6591b(f), and "the participation of . . . interested persons," 40 C.F.R. § 1501.7(a)(1).  The majority may disagree as to the extent to which this difference matters, but it cannot hide behind circuit precedent.  Even when bound by precedent, "we should endeavor not to break new ground or expand ahistorical precedents."  *Cervantes-Torres v. United States*, 169 F.4th 868, 888 (9th Cir. 2026) (R. Nelson, J., concurring).  The process at issue in *Alaska Survival* was different, and no principle announced in that case requires extending the precedent here.

In sum, *Alaska Survival* is best read, consistent with basic rules of administrative law, to establish that a lack of notice and an agency's practice of not considering the comments are exceptional circumstances sufficient to excuse waiver. *Cf. CSX Transp., Inc. v. Surface Transp. Bd.*, 584 F.3d 1076, 1079 (D.C. Cir. 2009).  No principle of administrative law excuses Alliance's failure to raise this issue in the notice-and-scoping process.  Under ordinary rulemaking principles, this is an easy case.  Instead, the majority gazes past basic principles to invent a new

adversariness requirement.  In doing so, the majority abandons rulemaking principles and applies factors relevant only to adjudication.  That is a mistake.

## II

The adversariness framework adopted by the majority belongs in the adjudication context, not in the rulemaking context.  The majority lifts this framework out of the Supreme Court's decisions in a pair of Social Security cases.  *See Sims*, 530 U.S. at 103; *Carr*, 593 U.S. at 83.  No other circuit has held that those factors apply in the rulemaking context.  By applying *Sims* and *Carr* to a factual context beyond adjudication, the majority splits with our sister circuits.  *See, e.g.*, *Advocs. for Highway & Auto Safety*, 429 F.3d at 1149 ("[C]ase law post-dating *Sims* gives little support to" a broader application); *Morris v. McDonough*, 40 F.4th 1359, 1364 (Fed. Cir. 2022) ("[W]e conclude that *Carr*'s holding does not support the categorical rule Mr. Morris advances.").  Those circuits are correct:  *Sims* and *Carr* addressed the narrow question of when issue exhaustion should be excused in informal agency adjudications, and their reasoning does not extend to rulemaking.

## A

The adversariness requirement makes no sense outside the adjudication context.  Start with *Sims*.  There, a fractured Supreme Court held that judicially imposed issue exhaustion does not apply to issues not raised before the Social Security Administration (SSA) Appeals Council.  The Appeals Council is an adjudicatory body.  So it made sense for the majority to start from the "analogy to the rule that appellate courts will not consider arguments not raised before trial courts." *Sims*, 530 U.S. at 108–09.  The interests in applying

the doctrine are at their peak when "the parties are expected to develop the issues" in an adversarial proceeding. *Id.* at 110. But a majority of the Court could not agree on how this principle applied to the facts.

A four-Justice plurality reasoned that Social Security benefit adjudications are a weak analogy to trial courts. Social Security proceedings "are inquisitorial rather than adversarial," and "[i]t is the ALJ's duty to investigate the facts and develop the arguments both for and against granting benefits." *Id.* at 110–11 (plurality opinion) (citing *Richardson v. Perales*, 402 U.S. 389, 400–01 (1971)). And the proceedings were so informal that the SSA's own forms and regulations affirmatively suggested that claimants need not specify the issues on appeal. *See id.* at 111–12.

Providing the fifth vote, Justice O'Connor dropped the analogy to trial court proceedings. She started at the general rule that administrative waiver generally applies, and that exceptions are narrow. In her view, an exception was appropriate when "the agency's failure to notify claimants of an issue exhaustion requirement" left them without notice of the need to develop the issues. *Id.* at 112–13 (O'Connor, J., concurring in part and concurring in the judgment). The informal nature of the proceeding could cause claimants to believe that there was no need to exhaust issues prior to seeking judicial review. *Id.* at 113–14. In other words, the claimant lacked notice.

*Sims*'s holding is thus best understood as an extension of the principle of "[s]imple fairness" that undergirds the administrative waiver doctrine. *See L.A. Tucker Truck Lines*, 344 U.S. at 37. The informal proceedings did not provide notice to claimants of the need to develop the issues, and the agency could not claim reliance on work that the

parties never had reason to perform.    *See Vaught v. Scottsdale Healthcare Corp. Health Plan*, 546 F.3d 620, 632 (9th Cir. 2008) ("The Plan's failure to notify claimants of any issue-exhaustion requirement also weighs against imposing one.").

*Carr* extended *Sims*'s reasoning from Appeals Council proceedings to the earlier stage of ALJ hearings.  If Social Security appeals are not subject to issue exhaustion, neither are original proceedings before an ALJ.  593 U.S. at 88–89. Building on the "analogy" between trial courts and administrative proceedings, *id*. at 88 (quoting *Sims*, 530 U.S. at 108–09), the Court identified the "critical feature" of "adversarial proceedings" that justifies the court analogy and its issue-exhaustion rules as whether "'the parties are expected to develop the issues in an adversarial administrative proceeding.'"    *Id*. at 88–89 (quoting *Sims*, 530 U.S. at 110).  The Court then examined the specific characteristics of ALJ hearings and found they were not adversarial.

Each consideration sprang from the ALJ's role as a presiding officer in an adjudicatory hearing. *See id*. at 90– 91.  The Court never mentioned any factor relevant to informal rulemaking.  True, formal rulemaking under the APA requires trial-like "proceedings with the full panoply of procedural devices normally associated only with adjudicatory hearings." *Vermont Yankee*, 435 U.S. at 547– 48; *see also* 5 U.S.C. § 553(c).  But notice-and-comment rulemaking does not require a formal hearing. *Vermont Yankee*, 435 U.S. at 547.  As there is no hearing, the agency and the public are not pitted as adversaries.  It is the public— not the agency—that bears the responsibility to "structure their participation" to alert "the agency to the intervenors' position and contentions." *Id.* at 553.

Our holding that issue exhaustion applies to notice-and-comment rulemaking does not follow from adversariness. *See, e.g.*, *Universal Health Servs.*, 363 F.3d at 1020. And nothing in *Carr* announces an intent to upend the administrative waiver doctrine in the rulemaking context. Instead, all the factors discussed in *Carr* relate to the duties of the adjudicator—not the rulemaker. *See* 593 U.S. at 90–91.

That does not mean adversariness is a concept invented solely for the adjudicatory process. Rather, adversariness was simply a stand-in for the familiar concept of notice. The Court considered whether the proceeding was adversarial because a formal, trial-like adjudication provides parties with notice that they are expected to develop issues before the agency, making it "particularly inappropriate" to excuse a failure to do so. *Sims*, 530 U.S. at 113 (O'Connor, J., concurring in part and concurring in the judgment). An informal adjudication may not. *See id.*

B

Properly understood, *Alaska Survival* does no more than probe the formality of the rulemaking process. It does not hold that the adversariness framework of *Sims* and *Carr* categorically controls the informal rulemaking context. *Alaska Survival* rested on "the informal nature of the[] proceedings and the lack of notice to interested parties of the 'appropriate time' in which to raise their objections to the agency's decision." 705 F.3d at 1081; *see also id.* at 1081 n.6 ("The D.C. Circuit has likewise refused to apply issue exhaustion in the rulemaking context when petitioners were unable to administratively raise their argument challenging lack of notice before the STB issued its final rule." (citing *CSX Transp.*, 584 F.3d at 1079)). That holding rests on

58          ALLIANCE FOR THE WILD ROCKIES V. HIGGINS

simple fairness. An agency that gives no notice cannot also demand that parties object. *See supra* at 51–52. Although the *Alaska Survival* court discussed *Sims*, nothing in that discussion requires going further than prior courts that have relied on the case for the truism that "*Sims* indicates that th[e] administrative-waiver doctrine does not represent an ironclad rule." *Advocs. for Highway & Auto Safety*, 429 F.3d at 1148.

There is one other reason the majority errs in its broad reading of *Alaska Survival*: that opinion was based on the narrow, fractured decision in *Sims*. To the extent that *Carr* clarified *Sims*, it did so in the narrow context of structural constitutional challenges. The *Carr* petitioners sought to assert a constitutional claim in federal court, challenging the appointment of the ALJs who initially heard their claims. 593 U.S. at 86. This claim was only clearly viable after the Court's prior decision in *Lucia v. SEC*, which held that SEC ALJs had been unconstitutionally appointed. 585 U.S. 237, 244–45 (2018); *see also Carr*, 593 U.S. at 86 (discussing *Lucia*).

In *Carr*, the SSA argued that the claimants had forfeited their Appointments Clause arguments by failing to raise them before the agency. *Carr*, 593 U.S. at 86. In rejecting this argument, the Court relied on two considerations limited to the "specific context of . . . Appointments Clause challenges." *Id.* at 92. First, the Court observed that "structural constitutional challenges . . . usually fall outside of . . . adjudicators' areas of technical expertise." *Id.* Second, the agency was "powerless to grant" constitutional relief. *Id.* The Court acknowledged that if the unraised issue had not involved the Appointments Clause, "the scales might tip differently." *Id.* at 92 n.5. The Court's decision can thus be understood to rest on "the fact that the Appointments

Clause challenges at issue fall into the well-established exceptions for constitutional and futile claims." *Id.* at 97 (Breyer, J., concurring in part and concurring in the judgment).

*Carr*'s reasoning, properly understood, confirms that *Alaska Survival* should have rested on futility and lack of notice—not on adversariness as a freestanding doctrinal category. Our sister circuits read *Carr* to give "weight to two considerations" unique to structural constitutional challenges in the agency adjudication context. *Morris*, 40 F.4th at 1364; *accord Fetting v. Kijakazi*, 62 F.4th 332, 338 (7th Cir. 2023) ("The Court stated that its decision was made in the specific context of petitioners' Appointments Clause challenges and that outside that context the scales might tip differently." (cleaned up)). The assertion that *Sims* establishes adversariness as a single controlling factor—rather than one factor among many—is untenable after *Carr*.

It would be one thing if, bound as we are by *Alaska Survival*, *see Miller v. Gammie*, 335 F.3d 889, 899 (9th Cir. 2003) (en banc), the majority held that the lack of formality in notice-and-scoping rulemaking rendered the administrative waiver doctrine inapplicable. I would disagree with that holding as a factual matter, *see supra* at 50–52, but it would be defensible under ordinary principles of administrative law. Instead, the majority discards those principles and holds that *Carr* establishes adversariness as an independent factor for applying the administrative waiver doctrine. That is not what *Carr* held. Nor is it how our sister circuits understand the opinion. *See Morris*, 40 F.4th at 1364; *Fetting*, 62 F.4th at 338. Indeed, the majority admits its split with those courts. *See* Maj. Op. at 30. That alone undermines the majority's holding, as we generally avoid creating circuit splits "absent a strong reason to do so."

*United States v. Chavez-Vernaza*, 844 F.2d 1368, 1374 (9th Cir. 1987).

The majority's error is not merely the misjudgment of ambiguous facts. *Alaska Survival*'s holding was narrow: adversariness, as one proxy for formality, may be a relevant consideration in assessing whether a rulemaking proceeding is formal enough to warrant judicially imposed issue exhaustion. The majority transforms that limited observation into something far broader: that adversariness is *the* consideration in the rulemaking context. The consequences are immediately apparent. Our holding in *Universal Health Services* that notice-and-comment rulemaking is subject to the administrative waiver doctrine does not follow from the majority's reasoning. 363 F.3d at 1019–20. Neither do the D.C. Circuit's repeated holdings that legal issues must be exhausted before the agency in the rulemaking context. *See, e.g.*, *Nuclear Energy Inst.*, 373 F.3d at 1290–91; *Nat'l Ass'n of Mfrs.*, 134 F.3d at 1111. Litigants and agencies will naturally ask if these cases pronounce sound principles of law for our circuit. Rather than limiting a stray statement in *Alaska Survival*, the majority fashions it into a new doctrine of administrative law inconsistent with prior case law from our court and any other court.

## III

A final question remains—how did the majority misapply so many precedents? The answer is not because of the arguments the parties made. Had the majority confined itself to the arguments Alliance presented, it would not have needed to import an adversariness framework from the adjudication context into a rulemaking context where it does not belong. Neither Alliance's opening brief nor reply brief

even cites *Sims*, *Carr*, or *Alaska Survival.* The words "adversariness" and "adversarial" never appear in those briefs, either. Those words did not enter the discussion until after oral argument and our sua sponte request for briefing on *Carr*. But even in its supplemental brief, Alliance never cited *Alaska Survival*, let alone claimed that any decision by this court requires extending *Carr* to the rulemaking context.

Part of the reason we adhere to the party presentation principle is to avoid the blunders the majority makes today. "[O]ur system is designed around the premise that parties represented by competent counsel know what is best for them, and are responsible for advancing the facts and argument entitling them to relief." *United States v. Sineneng-Smith*, 590 U.S. 371, 375–76 (2020) (cleaned up). Consistent with this principle, we have established that we should not entertain an "argument where the party that could benefit from the new law did not raise it in its briefs, although it had notice and opportunity to do so, and only discussed it in a supplemental brief filed at our request." *AMA Multimedia, LLC v. Wanat*, 970 F.3d 1201, 1215 (9th Cir. 2020), *overruled on other grounds by Briskin v. Shopify, Inc.*, 135 F.4th 739 (9th Cir. 2025) (en banc). Even if the majority's approach were correct, the proper course is "to deny a party the benefit of favorable legal authorities," as the majority's own citations show. *Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 100 n.5 (1991); *see also* Maj. Op. at 13 n.5.

To be sure, we must get the law right when the issue is before us. The majority failed out of the gate. But when we get the law wrong, the party presentation principles help confine the damage. Here, we asked the parties for their view on *Carr*, and they still failed to bring the theory the majority cites. On this procedural posture, a panel should

exercise caution—not interpret unbriefed cases to create a split with our sister circuits. *See supra* at 30. The majority had ample warning that it should apply the "cardinal principle of judicial restraint—if it is not necessary to decide more, it is necessary not to decide more." *Cervantes-Torres*, 169 F.4th at 874 (majority opinion) (citation omitted). As explained throughout, the majority could have resolved Alliance's appeal on far narrower grounds under existing precedent. Instead, the majority decides the appeal on broader grounds, and extends *Alaska Survival* past its breaking point. This is error. *See Margolin v. Nat'l Ass'n of Immigr. Judges*, 608 U.S. __, __,146 S. Ct. 1285, 1288 (2026) (summarily reversing the Fourth Circuit after it "*sua sponte* addressed a much broader" question than the issue briefed).

Alliance's repeated decision not to advance the theory the majority now adopts counsels against "the panel's takeover of the appeal." *Sineneng-Smith*, 590 U.S. at 379.

IV

For these reasons, I would hold that the administrative waiver doctrine applies to the HFRA notice-and-scoping process. Alliance had notice of the need to raise its wildland-urban-interface objection and a full opportunity to do so. It never did. It waived the issue, even a legal issue, before the agency. The majority reaches the opposite result only by discarding settled principles of informal rulemaking and importing an adversariness framework from Social Security adjudication that other courts refused to extend to the rulemaking context. The majority compounds this error by reaching issues the parties never presented.

I respectfully dissent.